THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DEBBIE FISHER, Defendant-Appellant.

Third District   No. 78-220

Opinion filed July 27, 1979.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, for appellant.

Bruce W. Black, State's Attorney, of Pekin (Phyllis J. Perko and Barbara A. Preiner, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

The defendant, Debbie Fisher, was charged by indictment with the unlawful delivery of a substance represented to be a controlled substance in violation of section 404 of the Illinois Controlled Substance Act (Ill. Rev. Stat. 1977, ch. 56½, par. 1404). After a bench trial in the Circuit Court of Tazewell County, the defendant was found guilty and sentenced to 1 year probation. The defendant appeals her conviction on the ground that she was entrapped into committing the offense by an undercover police officer.

Only two witnesses testified at the defendant's trial. The first was Special Agent Mark Williams of the Multi-County Enforcement Group (MEG). Williams testified that on the night of October 8, 1977, he was at the Devil's Den Tavern in Pekin. Williams was accompanied by his confidential source, Rod Meyer. After engaging in conversation with Meyer and other tavern patrons, Williams approached the defendant, a dancer, and sat down next to her at the bar. He said he then asked the defendant what kind of speed (amphetamine) she had for sale. In response Fisher told him that it was "cross," and that she would sell 20 "hits" (tablets) to Williams for $5. Eventually Williams and Fisher agreed upon a sale of 25 "hits" for $6. Williams gave Fisher the money, and Fisher left the bar and went into a back room. Approximately three minutes later the defendant returned, and giving Williams the $6 back, told him that she had to dance first and would give him the speed after dancing. After Fisher finished dancing, she again took the money from Williams and went into the back room. She returned to the bar about five minutes later,

and gave Williams a clear plastic vial containing 25 tablets of purported amphetamines. (Although Williams testified that Fisher told him during the course of their conversation that she had taken two "hits" before coming to work and was still "buzzing," the tablets purchased by Williams were in fact found not to be controlled substances.) Williams placed the vial in his pocket, and shortly thereafter departed with Meyer.

On cross-examination, Williams testified that he had spoken to defendant on five separate occasions prior to October 8. He stated that although he did not believe he attempted to purchase drugs from defendant on any of these previous occasions, he did not preclude the possibility that he might have attempted to make purchases from her prior to October 8. He also had contacts with Fisher on two occasions after the October 8 sale, but was unsuccessful in obtaining drugs from the defendant on these occasions. Williams testified that on one of these latter occasions Fisher told him that if he wanted drugs he would have to see the manager. Williams denied having given the defendant the impression on the day of the sale that his physical and mental condition was such that he desperately needed amphetamines.

The defendant was the other individual who testified at trial. Fisher stated that she had seen Williams in the tavern on three occasions within the week prior to October 8. The first time she met Williams he asked her if she had any "stuff," apparently referring to amphetamines. Fisher testified that her reply was she didn't know where any were located and didn't know who would have any, to which Williams responded, "I really need some." Her conversations with Williams on the other two occasions prior to the sale on October 8 were similar. Fisher testified that each time Williams acted "as if he was going to die" if he didn't get the amphetamines.

On October 8, Williams again came into the bar and engaged in a conversation with Fisher. According to the defendant, Williams acted as though he was ill and in desperate need of amphetamines. Fearful of Williams (Fisher had been struck in the face by a bar patron several weeks earlier) and desiring to have Williams leave her alone, Fisher told him that she would get some speed and went into the back room. In her purse she found a vial of tablets that a tavern patron had given her the previous August. Upon her return to the bar area, she gave Williams the vial. Fisher denied making the statement that she had taken several of the pills and was "buzzing" and also denied that she ever referred to the tablets in the vial as "cross." However, the fact that there was a sale (25 "hits" for $6) was uncontradicted. Fisher stated that at the time of the sale she believed the vial contained speed.

Fisher testified that within two days of the sale, Williams asked her if she had any more speed, and she replied that she didn't know where any

was located. She made a similar response several days later to Rod Meyer's query concerning a possible marijuana sale.

■■ The sole issue on appeal is whether the defendant was entrapped by Agent Williams into committing the offense. The defense of entrapment is found in section 7—12 of the Criminal Code:

> "§7—12. Entrapment] A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." (Ill. Rev. Stat. 1977, ch. 38, par. 7—12.)

Entrapment is an affirmative defense if established by the evidence. (*People v. Dollen* (1972), 53 Ill. 2d 280, 290 N.E.2d 879; *People v. Lewis* (1963), 26 Ill. 2d 542, 187 N.E.2d 700; *People v. Outten* (1958), 13 Ill. 2d 21, 147 N.E.2d 284.) Once the defendant presents some evidence in support of the contention that there was an entrapment, the State must prove, beyond a reasonable doubt, that the defendant was not entrapped. Ill. Rev. Stat. 1977, ch. 38, par. 3—2(b); *People v. Dollen* (1972), 53 Ill. 2d 280, 290 N.E.2d 879; *People v. Cross* (1978), 63 Ill. App. 3d 628, 379 N.E.2d 1319; *People v. Housby* (1975), 33 Ill. App. 3d 762, 338 N.E.2d 461.

In *Sherman v. United States* (1958), 356 U.S. 369, 2 L. Ed. 2d 848, 78 S. Ct. 819, the United States Supreme Court reaffirmed its decision in *Sorrells v. United States* (1932), 287 U.S. 435, 77 L. Ed. 413, 53 S. Ct. 210, in which it recognized the defense of entrapment in Federal courts, and stated:

> "Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials. (Emphasis supplied.) See 287 U.S., at 441, 451. To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The principles by which the courts are to make this determination were outlined in Sorrells. On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence. See 287 U.S., at 451." 356 U.S. 369, 372-72, 2 L. Ed. 2d 848, 851, 78 S. Ct. 819, 821.

■■■ The principles of *Sorrells* have been incorporated into a three-part test which this court has applied in determining whether an entrapment has occurred. For an entrapment to exist, (1) the idea of committing the

offense must originate not with the suspect but rather with the enforcement authorities; (2) the enforcement authorities must actively encourage the suspect to commit the offense; and (3) the purpose of the encouragement must be to obtain evidence for the prosecution of the suspect. The first part of the test involves two inquiries: First, does the suspect originate the idea of committing the offense; and second, is the suspect engaged in a course of conduct involving similar offenses, or other acts of the same offense if dealing with other persons. " 'Even if the answer to the first inquiry is negative, the person should not be considered worthy of protection if the answer to the second inquiry is positive, since he is not "an innocent person", induced to commit an offense of a type which he would not otherwise commit.' " *People v. Kadlec* (1974), 21 Ill. App. 3d 289, 293-94, 313 N.E.2d 522, 526 (quoting Ill. Ann. Stat., ch. 38, par. 7—12, Committee Comments—1961, at 437-38 (Smith-Hurd 1972)); see *People v. Jensen* (1976), 37 Ill. App. 3d 1010, 347 N.E.2d 371; *People v. Lewis* (1967), 80 Ill. App. 2d 101, 224 N.E.2d 647.

■■ We concern ourselves first with the origin of the idea to commit the offense. From the testimony of both witnesses it is apparent that on several occasions both prior and subsequent to the sale of the amphetamines Williams had attempted to purchase drugs from the defendant. On each of these occasions he was unsuccessful. We believe his failure to obtain drugs from Fisher on these occasions was due not to an inability on the part of an otherwise willing and criminally predisposed defendant to procure the drugs sought, but was due rather to the natural disinclination of an innocent person to engage in criminal conduct. It is uncontradicted that Fisher did not approach Williams for the purpose of making a drug sale. Taken alone, this is not determinative of the origin of the idea of committing the offense. However, when this fact is considered along with the fact that his efforts to procure drugs from Fisher on every meeting other than October 8 had been to no avail (the existence of such efforts never being expressly denied by Williams), we see a picture of an "unwary innocent" whose participation in criminal activity was initiated by the State.

■■■ The second element of entrapment is active encouragement to commit the offense on the part of the State. "[O]fficers may afford opportunities or facilities for the commission of crime, and may use artifice to catch those engaged in criminal ventures, but entrapment constitutes a valid defense if the officers inspire, incite, persuade or lure the defendant to commit a crime which he otherwise had no intention of perpetrating. [Citation.] The law frowns upon the seduction of an otherwise innocent person into a criminal career but tolerates the use of decoys and various other artifices to catch the criminal." (*People v. Outten* (1958), 13 Ill. 2d 21, 24, 147 N.E.2d 284, 286.) We are aware of

Williams' testimony which, if believed, reveals that the defendant unhesitatingly offered to sell drugs to him. We also acknowledge Williams' denial of feigning a need for amphetamines. However, given our finding of a lack of criminal predisposition on the part of the defendant, we find her testimony relating to Williams' activities and unsuccessful efforts to procure drugs from her, both prior and subsequent to this offense, as more believable. It is highly improbable that an individual, with no prior record of drug offenses, would voluntarily and unreluctantly engage in criminal conduct unless that person has been induced to violate the law. Fisher's testimony clearly reveals that after numerous attempts by Williams to have the defendant sell him amphetamines (all of which were resisted), an overwhelming desire to "get rid" of Williams and to have him stop bothering her compelled Fisher to commit the offense. This desire was no doubt intensified by the memory of the recent battery by another upon her in combination with Williams' highly effective portrayal of a "speed freak" heavily dependent upon amphetamines. (Fisher testified that Williams "acted as if he needed some speed real bad, and he hit the side of bar and said that if he didn't get any he was going to, you know.") It would appear that Williams' actions clearly constitute the type of encouragement by the State required to meet the second element of the entrapment test. Finally, because it is obvious that the purpose of the encouragement was to obtain evidence for the prosecution of the suspect, we find the third element of the test is met as well.

In the case at bar, the trial court found there to be no entrapment. In *People v. Cooper* (1974), 17 Ill. App. 3d 934, 937-38, 308 N.E.2d 815, 818, where a jury found no entrapment, the court stated: "To reverse a verdict as a matter of law, the evidence must disclose improper inducement on the part of the State and a lack of predisposition to commit the crime on the part of the defendant." Although the instant case was a bench trial, the findings must be the same. In the case at bar, through the application of the three-part entrapment test to the facts, we have found a lack of criminal predisposition on the part of Fisher, and an active encouragement by Williams to Fisher to commit the offense. Not only was the defendant entrapped, but most importantly the evidence presented by the State was insufficient to rebut the entrapment defense beyond a reasonable doubt.

For the foregoing reasons, the judgment of the Circuit Court of Tazewell County is reversed.

Judgment reversed.

ALLOY and SCOTT, JJ., concur.