THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK DUNN, Defendant-Appellant.

Fourth District   No. 4—93—0026

Opinion filed October 14, 1993.

David E. Leefers, of Jacksonville, for appellant.

Charles Colburn, State's Attorney, of Jacksonville (Norbert J. Goetten, Robert J. Biderman, and Richard Norris, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COOK delivered the opinion of the court:

Following a bench trial, defendant Mark Dunn was convicted of unlawful delivery of a controlled substance (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(b)(2)) and sentenced to four years of imprisonment with a recommendation for impact incarceration. Defendant contends his conviction should be reversed because he was entrapped as a matter of law. We affirm.

Nancy Perry testified she met defendant while working as an undercover narcotics agent with Central Illinois Drug Task Force (Task Force). Defendant worked as a bartender at the Work Release Lounge (Lounge) in Jacksonville, Illinois. Becky, a paid confidential source for Task Force, introduced Perry to defendant sometime prior to February 15, 1990, at the Lounge; Becky told defendant that Perry was her sister. At this first meeting, the two asked defendant if he had any cocaine to sell, but they were unsuccessful in making a purchase. Perry went to the Lounge (usually with Becky) approximately 4 to 10 times in order to establish a relationship with defendant and to build his trust, and on each occasion she asked defendant to sell cocaine or other drugs to her. Perry was unsuccessful in purchasing drugs. However, defendant never specifically refused to sell drugs to her, and she "was successful in getting more information." Perry testified she would stay at the Lounge for an hour or two on each occasion, and she would have a couple drinks but never drank to the point of intoxication. Perry had never observed defendant selling, buying, or using drugs prior to February 15.

On February 15, Perry and Becky went to the Lounge and again asked defendant about purchasing cocaine. Perry testified defendant told them "he would sell three grams for four hundred dollars" but "the owner of the tavern was there at that time and that he was going to wait until he left in order to make some phone calls" to "his supplier." Defendant made one phone call, and then told Perry and Becky he could sell cocaine to them, but that he would have to go to

Alexander, Illinois. Perry told defendant that she would follow him to Alexander. Perry and Becky went to the Eagle Creek Saloon (Saloon) in Alexander; defendant met them there and told Perry he had the cocaine. Perry and defendant then walked to defendant's truck, where defendant showed Perry a clear plastic bag with eight packages of cocaine in it.

Perry asked defendant if any of the cocaine was "spoken for" and defendant said "there was a gram and a half spoken for" but he would sell the rest to her. Defendant told Perry that he was not getting any financial benefit from this sale. Defendant also told Perry he did not know how much cocaine was in the whole package or in the individual bags. Perry had a scale and offered to weigh the bags; she then weighed the bags and determined they were "gram bags." Defendant agreed to sell Perry the six heaviest bags, telling her "the quality was very good because it was rocky." Defendant told Perry he would sell six bags to her for $500. Perry testified that "usually six bags, six grams would go for six hundred, so he was saying he was giving me a break with the hundred dollars, all six for a total of five hundred." Perry gave defendant $500 for the six bags of cocaine, plus a $20 tip for his time. Defendant told Perry his work schedule and that if she ever wanted any more cocaine she should call him a day in advance so he could contact his "supplier" and get the cocaine for her the next day. Perry went back inside the Saloon to get Becky and the two of them left. Perry subsequently met with an inspector and placed the cocaine in a temporary holding facility. About one week later, Perry contacted defendant to purchase more cocaine, but was unsuccessful.

Arthur Avart, master sergeant with the Illinois State Police, testified that on February 15, 1990, he was the supervisor of the Central Illinois Inspectors Group and that he was involved in surveillance with Perry. His testimony corroborated Perry's testimony, although he did not see the actual drug transaction. He was at the Lounge when Perry and Becky walked in the bar. Perry and Becky spoke to defendant for a while, then defendant made a phone call. After defendant made one phone call, he left with Perry and Becky; Avart followed them to Alexander. Avart observed defendant talking to Perry at the Saloon. Perry and defendant went outside for 10 to 15 minutes then Perry returned to the bar and left with Becky.

Defendant admitted he sold cocaine to Perry, but his version of the drug sale differed from Perry's in some respects. He indicated he first met Becky and her boyfriend, Bruno, in August 1989. Becky came to the Lounge at least three or four times a week, but Bruno

was not allowed inside because he had been involved in an altercation there. Bruno called defendant about six or seven times at the Lounge, threatened defendant, and asked defendant to get cocaine for him. Defendant refused. Every time Becky came to the Lounge she asked defendant to get cocaine for her, sometimes offering sex as payment. Defendant refused. In November, Becky began coming to the Lounge with Perry. Perry would have a drink every time she was in the Lounge and sometimes would drink to the point of intoxication. Becky and Perry came to the Lounge three or four times a week and would ask defendant to secure cocaine for them; each time either Perry or Becky would initiate the talk about cocaine. Defendant declined, each time responding " 'Ain't got the time for it,' 'I don't do it,' 'I don't want to be around it,' you know, 'just leave me alone.' "

According to defendant, on February 15, 1990, Becky and Perry were in the Lounge and Becky again brought up the subject. Becky told defendant "they were going on a road trip and if [he] would get some this time, they would never ask [him] again." Defendant was "tired of dealing with them" and said " 'Okay, this will be the only time.' " Although defendant did not have a cocaine supplier, he had some idea where he might be able to get some cocaine. Defendant stated he never told them he had to call his "supplier." Defendant made two calls to a former girlfriend, who agreed to get some cocaine for him. Defendant told Becky and Perry to meet him at the Saloon in Alexander; he testified there was no discussion of price or weight with them until they all met at the Saloon. Defendant picked up the cocaine and the person who sold it to him told him " 'it was real good, it was rocky,' " and she set the price at $50 per bag. Defendant then met Perry; she weighed the bags and selected six bags for $300. She gave defendant a $20 tip and defendant told her he would give her a couple drinks when she came by the Lounge. Defendant testified he never told Perry to contact him if she wanted to buy more cocaine, and had never thought about selling drugs until Perry gave him the idea.

The trial court considered the defense of entrapment but determined the key to this case was credibility. The trial court found defendant's testimony to be "almost entirely incredible." Focusing on Perry's testimony, the court found the State proved beyond a reasonable doubt that defendant was not entrapped since the evidence showed he was predisposed to commit the offense, and he was not actively encouraged to sell cocaine. The court found defendant committed the offense of unlawful delivery of a controlled substance.

Defendant contends he was entrapped as a matter of law. Section 7—12 of the Criminal Code of 1961 states:

"A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." (Ill. Rev. Stat. 1989, ch. 38, par. 7—12.)

Once defendant has presented some evidence in support of this defense, the State must prove defendant was not entrapped. *People v. Collins* (1990), 199 Ill. App. 3d 163, 167, 556 N.E.2d 835, 837.

Under some definitions, every staged drug buy arranged by law enforcement authorities could amount to entrapment.

"For an entrapment to exist, (1) the idea of committing the offense must originate not with the suspect but rather with the enforcement authorities; (2) the enforcement authorities must actively encourage the suspect to commit the offense; and (3) the purpose of the encouragement must be to obtain evidence for the prosecution of the suspect." (*People v. Fisher* (1979), 74 Ill. App. 3d 330, 333-34, 392 N.E.2d 975, 978.)

(See *People v. Chanath* (1989), 184 Ill. App. 3d 521, 524, 540 N.E.2d 468, 470-71; *cf. People v. Darnell* (1990), 214 Ill. App. 3d 345, 354, 573 N.E.2d 1252, 1258.) Nevertheless, staged drug buys and sales are recognized as a legitimate law enforcement tactic. A defendant's predisposition, as well as governmental involvement, must be considered. (*People v. Cross* (1979), 77 Ill. 2d 396, 404, 396 N.E.2d 812, 816 (where the government supplied the drugs which defendant sold).) There is no entrapment if the authorities merely afford a person the opportunity for committing the offense "in furtherance of a criminal purpose which such person has originated." (Ill. Rev. Stat. 1991, ch. 38, par. 7—12.) It matters not that the specific transaction is conceived and arranged by the authorities, so long as defendant has some general purpose, some predisposition, to violate the law.

In some of these cases the agent or the informant has applied what might be described as excessive pressure in order to persuade defendant to participate in the sale. For example, in *Fisher* (74 Ill. App. 3d at 335, 392 N.E.2d at 979), defendant was a dancer in a bar, and testified the undercover agent acted as though he were ill and in desperate need of amphetamines. She testified she was fearful of the agent and had been struck in the face by a bar patron several weeks

earlier. (See also *People v. Martin* (1984), 124 Ill. App. 3d 590, 464 N.E.2d 837 (relentless coercion by informant); *People v. Poulos* (1990), 196 Ill. App. 3d 653, 554 N.E.2d 448 (where the informant supplied the cocaine).) Excessive pressure on the part of the agent may amount to entrapment even where defendant is predisposed to violate the law. Merely asking 4 to 10 times to make a purchase, in the present case, would not appear to constitute excessive pressure. It could be argued that entrapment should not be a defense where no excessive pressure is employed, where the agent merely asks defendant if he will make a sale. Where no wrongdoing is involved on the part of the agent, and defendant is ready to make a sale, perhaps there should be liability even if defendant had not previously thought about selling drugs. Nevertheless, Illinois law, both statutory and case law, is clear that a drug sale arranged by governmental authorities will constitute entrapment unless defendant had a predisposition to engage in such conduct.

Among the factors considered in determining whether predisposition exists are the defendant's initial reluctance to commit the crime, his familiarity with drugs, and his ready access to a source. (*People v. Schillaci* (1988), 171 Ill. App. 3d 510, 517-18, 526 N.E.2d 871, 875-76; *Collins*, 199 Ill. App. 3d at 167, 556 N.E.2d at 838.) Defendant was initially reluctant to commit this crime. However, it is to be expected that one suspected of selling drugs will be extremely cautious before selling to a stranger, and may refuse to make a number of sales before any sale is made. (See *People v. Foreman* (1987), 153 Ill. App. 3d 346, 356, 505 N.E.2d 731, 737 (where the appellate court found no error in refusing to give an instruction on entrapment).) According to Perry, defendant's reluctance never rose to the point of resistance, at which he would have told Perry that he did not sell drugs or that he did not want to be bothered anymore. The argument can be made that defendant was not familiar with drugs: that he did not have a scale, that he did not know the weight of the cocaine, he sold it at a price below the usual price. Defendant may not have had ready access to these drugs: he refused to make a number of sales, and when he finally agreed, the parties had to travel to another town.

According to the testimony of the undercover narcotics agent, Perry, defendant did have some familiarity with drugs. Defendant quoted a price of three grams for $400, then a price of six bags for $500. He described the cocaine he sold as being of good quality "because it was rocky." He made references to "his supplier," he refused to sell a gram and a half because it was "spoken for," and told Perry to contact him if she ever wanted any more. Defendant denies that

testimony, although he admits repeating what the person who had given him the drugs had said, that the quality was good because it was rocky. According to defendant Perry set the price and selected the bags she wanted to purchase. Defendant also testified he was afraid of Becky, and her boyfriend Bruno, but defendant sold them no drugs, and it is difficult to understand how that relationship would persuade defendant to sell drugs to Perry.

Defendant contends he sold cocaine to Perry "to just get her off of [his] back" because she and Becky had "persisted" in asking him for cocaine three to four times a week for several months. Yet, defendant testified that when Becky was at the Lounge he talked to her "whenever [he] got time." Additionally, defendant stated that after he sold the cocaine to Perry, he told her to come by the Lounge and he would give her a couple of drinks. These actions seem inconsistent with defendant's stated goal of getting Perry and Becky "off of [his] back." It is the function of the trier of fact to determine the credibility of witnesses and the weight to be given their testimony. *People v. Tye* (1990), 141 Ill. 2d 1, 13, 565 N.E.2d 931, 937.

Because the determination of defendant's predisposition to commit crime is dependent on the facts of the case, it is recognized that the issue is one for the trier of fact. (*People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528.) The relevant question on review is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) That standard of review is applicable here, just as it must be applied on review following any criminal conviction where an affirmative defense has been properly considered and rejected by the trier of fact. (*People v. Gannon* (1991), 213 Ill. App. 3d 560, 565-66, 572 N.E.2d 1133, 1136.) This court will not reverse a conviction unless the evidence was so improbable that it raises a reasonable doubt of guilt. *Schillaci*, 171 Ill. App. 3d at 520, 526 N.E.2d at 877.

The informant, Becky, was not called as a witness in this case. Although the State's failure to call an informant to testify generally gives rise to an inference against the State (*Poulos*, 196 Ill. App. 3d at 661, 554 N.E.2d at 453), that inference is not controlling (*Darnell*, 214 Ill. App. 3d at 359, 573 N.E.2d at 1261). The buy in this case was not made by the informant but by the agent, Perry, and Perry testified fully as to the events which transpired.

The trial court is in the best position to weigh the credibility of witnesses, and based on the evidence the trial court found most credible here, there was no entrapment as a matter of law. We affirm the judgment of the circuit court of Morgan County.

Affirmed.

McCULLOUGH and KNECHT, JJ., concur.