SECOND DIVISION
MARCH 31, 2011

1-08-2637

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 MC6 000278 |
| | ) | |
| KAREN HAND, | ) | Honorable |
| | ) | Thomas J. O'Hara, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion. Justices Karnezis and Connors concurred in the judgment and opinion.

### OPINION

In August 2008 a jury in the circuit court of Cook County found the defendant, Karen Hand, guilty of: (1) the offense of resisting or obstructing a peace officer (720 ILCS 5/31-1(a) (West 2006)) for which she received a sentence of one year of conditional discharge; and (2) the offense of aggravated assault of a peace officer (720 ILCS 5/12-2(a)(6) (West 2006)) for which she received a concurrent sentence of one year of supervision. The defendant filed a timely appeal. Ill. S. Ct. R. 606 (eff. Mar. 20, 2009). On appeal, she raises the following issues: (1) whether the trial court erred in denying her motion to quash arrest and suppress evidence; and (2) whether she was legally justified in her use of force against the police officer who was attempting to enter her home.

For the following reasons, we affirm the defendant's convictions and sentences.

BACKGROUND

The evidence at trial reveals the following sequence of events that took place starting at approximately six o'clock in the evening of December 5, 2006. Frank Hand (Frank), the defendant's husband, left the apartment he shared with the defendant in Riverdale, Illinois, and called the police. Frank reported that he had concerns about his wife and his two children who were in the apartment with his wife. Officer Mark Kozeluh of the Riverdale police department responded to the call and spoke with Frank outside the apartment building. Kozeluh testified that Frank had been drinking, but "absolutely" was coherent. Frank asked for assistance in retrieving some personal items from the apartment. Kozeluh, dressed in full police uniform, went by himself to the defendant's apartment door and knocked. A female inquired who was knocking and Kozeluh responded that it was the Riverdale police. Nothing happened, and Kozeluh knocked two more times.

Kozeluh then verified with Frank and a neighbor that Frank lived in the apartment with the defendant and the children. Frank gave Kozeluh the keys to the apartment. Kozeluh returned to the door of the apartment, knocked again and announced his name and office. After waiting for a response and hearing none, Kozeluh used the key to open the deadbolt lock. A chair had been propped against the door so that it only opened approximately six to eight inches. Kozeluh made eye contact with the defendant and again told her who he was. The defendant told Kozeluh that if he closed the door, she would remove the chair. After the door was closed, however, the defendant locked the door. Kozeluh used the key again but felt resistance as if someone was holding the lock from the other side of the door. He was able to unlock the door but again could only open it six to eight inches. Kozeluh stuck part of his head and shoulder into the door opening and could see inside

2

the apartment. Kozeluh again told the defendant to open the door, but she picked up a baseball bat that was nearby and swung it toward his head. Kozeluh ducked and the bat hit the door and door frame.

Kozeluh testified that at that point, he deployed a Taser gun at the defendant which delivered a high voltage stun through two darts. The defendant dropped the bat and ran away from the door, screaming. Kozeluh testified that because the defendant was able to move, the Taser gun had not deployed effectively. If it had been effective, it would have resulted in the defendant's immobilization. Kozeluh then kicked the door open and pursued the defendant. He told the defendant she was under arrest and that she needed to get down on the floor.

Kozeluh testified that the defendant did not cooperate. She began yelling, kicking at him and swinging her arms as he attempted to place her under arrest. The defendant struck Kozeluh's chest and kicked his leg several times. The two struggled for approximately a minute or two until Kozeluh forced her to the floor. At this point, the defendant reached into her right rear pocket and Kozeluh could see a metal object in her pocket. Kozeluh testified that he used his Taser gun "at least twice" to apply a dry stun to the defendant's back. Once Kozeluh was able to handcuff the defendant, he recovered a knife in a leather sheath from her rear pocket. Additional police officers arrived and one spoke with the children while Kozeluh took custody of the baseball bat and the knife.

The defendant testified at trial that three times during the two weeks prior to December 5, 2006, several men that she did not know came to her apartment door. The men banged on the door, the window in the kitchen and the window in the children's room and told the defendant to open the door. The defendant testified that she felt afraid for herself and her children.

On the night in question, Frank had been home a short time and he and the defendant argued over money. Frank had been drinking and the defendant told him to leave because he was not contributing financially to the children's needs. Approximately 15 or 20 minutes after Frank left, the defendant heard a knock on the door. A person who identified himself as a police officer told her to open the door. The defendant, however, did not believe that it was a police officer at her door. The person went away, but then returned about 10 to 15 minutes later and knocked again.

The defendant became apprehensive of the stranger at the door. She had been keeping a chair propped against the door knob because the door did not lock properly and she was afraid someone would break in. The defendant had a knife with her and a baseball bat nearby that Frank had given her for protection against intruders. The porch area was dark, which prevented her from seeing the person who was knocking and she did not have a working phone in the apartment. The defendant could see that the door was being opened by someone using her husband's keys. She testified that she felt like she was being invaded and that she had to protect her children.

After the person opened the door about six inches, the defendant pushed the bat through the space to push him back. She did not believe she had hit him. The intruder tried to push his way through the door, backed up, and the defendant saw that he had a gun. After the intruder shot her in her left shoulder, she experienced excruciating pain. She saw that there were wires coming from where she had been shot, and she knew that she had not been hit by a bullet. She testified that "I figured no one would have a gun like that other than a policeman." Screaming in pain, the defendant walked toward the back of the apartment in order to direct the intruder away from her children's room.

Kozeluh pushed the door open and shot her in the back with the Taser gun. The defendant testified that there was "[a] good five minutes of shocking" while she was standing, and that Kozeluh said to her, "Get down on the ground, bitch." She testified that she tried to get to the floor but was in pain. She never reached for the knife in her back pocket. Kozeluh shot the defendant on her chest with the Taser gun after she was on the floor. Kozeluh told her to turn over and shot her in the back with the Taser gun. These shots were not done with the wires coming from the gun, but with the gun pressed to her body. The defendant stated that Kozeluh tried to break her wrist and eventually got her into handcuffs. As she was being handcuffed, other police officers arrived. The entire incident from when Kozeluh entered her apartment to when she was handcuffed lasted approximately 15 to 20 minutes.

The defendant testified that when she asked a female police officer in the apartment to help her, the female police officer stated that they were helping her. The defendant's knife was removed from her pocket by the police. The defendant stated that she never intentionally struck Kozeluh or tried to resist him. At the time she picked up the baseball bat, she thought he was a home invader.

Prior to trial, the defendant filed a motion to quash arrest and suppress evidence based upon a violation of her fourth amendment rights. At the hearing on the motion, Kozeluh's testimony was similar to his trial testimony, with the addition of Frank's statements to him when he arrived on the scene. Kozeluh stated that Frank was concerned that, based on past experiences, his children were not eating properly or being cared for properly by the defendant. Frank was also concerned that the defendant had mental and emotional issues because she had stated that she talked with the dead and she was involved with sorcery and witchcraft. Frank was not a witness at trial, and the hearsay

statements were not allowed into evidence by the trial court.[1]

The trial court denied the defendant's motion to quash arrest and suppress evidence, and denied her subsequent motion to reconsider the ruling. The trial court found that Kozeluh was engaged in a community caretaking function and that exigent circumstances justified his warrantless entry into the apartment. Thus, the trial court concluded that the police officer acted reasonably and there was no violation of the defendant's fourth amendment rights.

After deliberations, the jury found the defendant not guilty of the battery of Kozeluh; guilty of aggravated assault of Kozeluh; and guilty of resisting or obstructing a peace officer. The trial court denied the defendant's motion for a new trial and sentenced her to a one-year term of conditional discharge on the resisting arrest conviction, concurrent with one year of supervision on the aggravated assault conviction. The defendant filed a timely notice of appeal.

ANALYSIS

The first issue that the defendant raises on appeal is whether the trial court erred in denying her motion to quash arrest and suppress evidence because there was no justification for the police officer's warrantless entry into her apartment. The United States and Illinois Constitutions guarantee the right of an individual to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6. It has been long held that evidence obtained as a result of an unlawful entry and arrest cannot be admitted into evidence in court. *Wong Sun v. United States*, 371 U.S. 471,

---

[1]The defendant was initially charged with two counts of endangering the life or health of the two children by engaging in an aggressive act of violence against a police officer in their presence and by withholding from them proper access to nutrition and healthcare. These counts were later dropped. The defendant was also charged with battery of Kozeluh.

485 (1963). A court reviewing a motion to suppress evidence, although using a *de novo* standard, will give great deference to the trial court's factual finding and will not reverse those findings unless they are against the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542, 857 N.E.2d 187, 195 (2006).

The trial court agreed with the defendant that Kozeluh had not been given consent to enter the defendant's apartment based on Frank's acquiescence. A nonpresent cotenant cannot give consent to a third party to enter premises on behalf of the co-tenant who is present and objecting. *Georgia v. Randolph*, 547 U.S. 103, 114 (2006). A warrantless search or entry is impermissible unless it fits within a specifically established and well-delineated exception to the warrant requirement. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). A well-recognized exception to the warrant requirement is the community caretaking or public safety exception. *Cady v. Dombrowski*, 413 U.S. 433, 440-41 (1973) (where the search of a car towed after an accident was found to be justified for the protection of the public because it was believed that it contained a gun).

During the hearing on the defendant's motion to reconsider the trial court's denial of her motion to suppress evidence and quash arrest, defense counsel argued that Kozeluh's entry was not justified based upon the community caretaking exception to the fourth amendment. The defendant also argued during the hearing and in her opening brief that there were no exigent circumstances that justified the entry.

An exigent circumstances analysis which the defendant promotes on appeal is not appropriate under the facts of this case. Under that theory, the actions of police are examined to determine whether there is a clear showing of probable cause to arrest a defendant. After it has been determined

that a police officer has appropriate probable cause for an arrest, further factors are required in order to justify a warrantless entry into the defendant's home. *People v. Morgan*, 388 Ill. App. 3d 252, 270, 901 N.E.2d 1049, 1064-65 (2009). Here, Kozeluh was not attempting a warrantless entry into the defendant's home to arrest a crime suspect, but instead was seeking to inquire as to the welfare of the children in the defendant's home.

The trial court ruled that the entry by the police officer was justified because of the community caretaking exception to warrantless entries and searches. The trial court noted Frank's concern for his children and his request that Kozeluh accompany him into the apartment to retrieve some personal items. The trial court stated in its ruling on the motion to reconsider its denial of the motion to suppress evidence:

> "Who is to know whether or not that child has not been fed for three hours, three days, three weeks, three months? And to say that's not an emergency and the officer should have - - should have done other things and followed other paths in order to gain entry, I don't think is reasonable. I think the officer acted reasonably.
>
> Also, that the wife was practicing witchcraft. There was no testimony about what the officer believed that meant. So I have to infer from some of my common experiences as to what quote-unquote 'witchcraft' is. And there certainly are sinister if not violent portions of witchcraft that certainly could give an officer some additional reason as to his emergency situation for entering the property."

8

The trial court went on to say that the police officer had reasonable grounds to believe that there was immediate need for his assistance for the protection of life.

It has been recognized that emergency-assistance searches are exercises of a police officer's community caretaking function. *People v. Lewis*, 363 Ill. App. 3d 516, 526, 845 N.E.2d 39, 49 (2006) (citing *Cady*, 413 U.S. at 441-43). In 2006, our supreme court clarified the use of the term "community caretaking" which had been imprecisely used in previous Illinois decisions to describe a type of police encounter. The three tiers of police encounters that courts have traditionally recognized are: (1) arrests, which must be supported by probable cause; (2) brief investigative stops which must be justified by a reasonable, articulable suspicion of criminal activity; and (3) encounters involving no coercion or detention and therefore do not involve fourth amendment rights. *Luedemann*, 222 Ill. 2d at 544, 857 N.E.2d at 196.

The term "community caretaking" had been used to describe the third tier of police-citizen encounters, which were consensual, did not require probable cause or reasonable suspicion, and did not involve fourth amendment interests. *Id*. at 544, 857 N.E.2d at 196. The court in *Luedemann* noted that the community caretaking doctrine, however, is analytically distinct from consensual encounters and is used to validate a search or seizure as reasonable under the fourth amendment. *Id*. at 548, 857 N.E.2d at 198-99. Community caretaking refers to a capacity in which the police are performing acts unrelated to the investigation of a crime. *Id*. at 545, 857 N.E.2d at 197.

Expanding on the analysis in the *Luedemann* case, our supreme court recently explained why there is a need for courts to formulate the community caretaking exception to warrantless searches. In the case of *People v. McDonough*, the court stated:

> "Rather than describing a tier of police-citizen encounters, community caretaking refers to a capacity in which the police act when they are performing some task unrelated to the investigation of crime, such as helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, or helping inebriates find their way home." *People v. McDonough*, 239 Ill. 2d 260, 269, 940 N.E.2d 1100, 1107 (2010).

Two general criteria must be present for a valid community caretaking exception to a prohibition against a warrantless search. The first is that the law enforcement officer must be performing some function other than investigating a crime. *Id*. at 272, 940 N.E.2d at 1109. The objective circumstances of the situation, not the subjective motives of the police officers, should be scrutinized when ruling on the validity of a search. *Id*. at 272, 940 N.E.2d at 1109. The second consideration is that the scope of the search must be reasonable because it was done to protect the safety of the public. *Id*. at 272, 940 N.E.2d at 1109. Again, the question of reasonableness is measured in objective terms by looking at the totality of the circumstances. *Id*. at 272, 940 N.E.2d at 1109. "The court must balance a citizen's interest in going about his or her business free from police interference against the public's interest in having police officers perform services in addition to strictly law enforcement." *Id*. at 272, 940 N.E.2d at 1109.

The defendant argues that Kozeluh was motivated by the desire to investigate possible allegations of child abuse or neglect, which are closely tied to law enforcement, as evidenced by his testimony that he felt Frank's statements to him "needed to be investigated further." A suspicion

about the children's lack of proper care, the defendant argues, does not create probable cause for the entry. However, probable cause does not need to exist when the police are engaging in community caretaking. It is clear that Kozeluh was not investigating a crime, in spite of his statement that the situation "needed to be investigated further." Viewed in its proper context, Kozeluh was not describing a criminal investigation, but an inquiry into the children's well-being based on Frank's expressed concerns.

The defendant contrasts the facts in her case to those in *People v. Mikrut*, 371 Ill. App. 3d 1148, 864 N.E.2d 958 (2007), where the court found that the police officer's entry into the defendant's home without his consent was justified under the community caretaking function. In the *Mikrut* case, a cohabitant asked the police for assistance in retrieving her belongings from the defendant's home because she feared the defendant. The appellate court affirmed the trial court's grant of the defendant's motion to suppress evidence, finding that although the entry into the defendant's home was justified, the scope of the police officer's search was unreasonable. *Id*. at 1153, 864 N.E.2d at 963.

The defendant argues that because Frank did not actually accompany Kozeluh when he was attempting to gain entry into the apartment, Frank was not requesting protection against the defendant in order to retrieve his belongings. The defendant contends that Frank did not fear for his safety, in contrast to the cohabitant seeking assistance in the *Mikrut* case, where the warrantless entry was determined to be justified. The defendant argues that the trial court improperly relied on Frank's request to retrieve personal items in the apartment to justify the warrantless entry.

A review of the record shows that the trial court's ruling that the community caretaking

exception applied in this case was not primarily based upon Frank's request to obtain his personal belongings in the apartment. The trial court's ruling was founded instead on the police officer's reasonable concern for the welfare of the children. Frank had told Kozeluh that he feared that his children were not being fed. Also, Frank was concerned about the children's well-being in the context of the defendant's mental health because she had told him she talked with the dead and mentioned witchcraft and sorcery to him. The defendant's failure to respond further to Kozeluh after she acknowledged his knock on the door and announcement of his office was not what the police officer expected when performing a routine well-being check. The defendant would not open the door or talk to Kozeluh. The defendant resisted Kozeluh's attempt to open the door even after she agreed to open it for him. Evaluating the totality of the circumstances, Kozeluh was justified under the community caretaking exception to enter the defendant's apartment.

During the hearings in the trial court and on appeal, the defendant suggested less intrusive methods should have been used by the police officer in spite of the defendant's uncooperative behavior. For example, the defendant argues that Kozeluh could have requested the assistance of a child protection agency or advised Frank to get a court order of protection against the defendant. If we were to take the defendant's argument to its logical conclusion, a police officer who has a reasonable basis to inquire about someone's welfare would be required to retreat and seek other methods of gaining information if the person from whom he is seeking information simply refuses to cooperate. That result would surely thwart the intent of the community caretaking exception to the fourth amendment. Police would never be able to use reasonable judgment to enter a dwelling even if the circumstances warranted the entry. Our courts have recognized that the community caretaking

12

exception is necessary for the public's protection when a police officer objectively and reasonably believes there is a need to seek information about an individual's well-being.

We find reasonable the trial court's ruling that there were sufficient circumstances to justify the community caretaking exception to the prohibition against a warrantless entry. Under the guidelines set forth in the *McDonough* case, the objective circumstances that Kozeluh faced justified the application of the community caretaking exception. Further, the scope of the particular search was reasonable under the facts, once Kozeluh was inside the apartment. Therefore, the trial court correctly ruled that was no need to suppress the defendant's arrest or the evidence consequently obtained.

The next issue the defendant raises on appeal is whether her convictions for aggravated assault and resisting a peace officer should be reversed because she was justified in the use of force in the defense of her home. A reviewing court will not disturb the findings of a trier of fact if, after examining the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Gannon*, 213 Ill. App. 3d 560, 565, 572 N.E.2d 1133, 1136 (1991). That same standard is applicable when an appellate court reviews the trier of fact's rejection of an affirmative defense. *People v. Dunn*, 251 Ill. App. 3d 772, 778, 623 N.E.2d 764, 769 (1993).

The jury was given the following instructions:

> "A person is justified in the use of force when and to the
> extent that he reasonably believes that such contact is necessary to
> prevent another's unlawful entry into a dwelling.

A Peace Officer need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest or to defend himself from bodily harm while making the arrest.

A person is not authorized to use force to resist an arrest which he knows is being made by a peace officer, even if he believes that the arrest is unlawful and the arrest in fact is unlawful."

The defendant claims that she was frightened by Kozeluh's illegal intrusion and that her attempt to resist his entry into her apartment was justified and not excessive.

The State points out that the defendant did not object to the jury instructions given at trial, nor did she question the jury instructions in her motion for a new trial. The defendant counters that she is not raising the propriety of the jury instructions. She claims she is simply noting that the instructions for both aggravated assault and resisting a peace officer allowed for a conviction based upon her swinging a bat at the police officer even though she was justified in doing so.

The defendant further argues that the State incorrectly commented during closing argument that, "Not only did the defendant prevent the officer from determining whether or not there was something wrong, she then swung a bat at him, went straight back to her bedroom and then kicked and flailed in an attempt to defeat the arrest." The defendant claims that through this closing argument statement, the State was asking the jury to consider the defendant's resistance to the police officer's unlawful entry for purposes of the charge of resisting a peace officer.

There is nothing in the record to support the argument that the jury used the defendant's act of swinging the baseball bat at Kozeluh and not her actions during the arrest as the basis for finding the defendant guilty of resisting a peace officer. In light of the entire testimony given at trial, and the instructions given to the jury, it cannot be concluded that this single statement by the State during closing argument influenced or tainted the jury as the defendant claims.

The defendant advances that Kozeluh was not statutorily protected from resistance by her when he engaged in the illegal entry into her apartment, as he would be protected when he was effectuating an arrest. The defendant cites the case of *People v. Young* for the principle that when the police are found to be engaged in unauthorized activities, they are not statutorily protected from resistance by a citizen. *People v. Young*, 100 Ill. App. 2d 20, 24-25, 241 N.E.2d 587, 589-90 (1968). In that case, the police attempted to execute a warrant at an incorrect address. The defendant, who lived at the incorrect address, resisted and struck the police officer. One issue on appeal was whether the police officer was engaged in an "authorized act," a requirement of the offense of resisting arrest. Ill. Rev. Stat. 1965, ch. 38, par. 31-1 (now 720 ILCS 5/31-1(a) (West 2008)). The State argued that the act of the police executing an illegal warrant was in the same category as the police making an illegal arrest. The court did not agree and ruled that because the police officer was not authorized to search the defendant's apartment, the defendant did not violate the statute by resisting him. *Young*, 100 Ill. App. 2d at 25, 241 N.E.2d at 590.

The theory that the defendant is advancing here is based upon the assumption that the police officer's entry was unlawful, as in the *Young* case. Here, the trial court found the entry was lawful and the record supports that conclusion. Kozeluh was in full uniform when he was attempting to

enter her apartment and he announced his office several times to the defendant. The defendant testified at trial that after she observed the type of gun that Kozeluh was using, she realized that the intruder must have been a police officer. Guided by the instructions given at trial, and after scrutinizing the testimony and demeanor of the witnesses, the jury rejected the defendant's affirmative defense and determined that the defendant was guilty of aggravated assault of Kozeluh and guilty of resisting or obstructing a peace officer.

After a review of the evidence in the light most favorable to the State, we conclude that any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of both offenses. Accordingly, the jury's verdicts and the court's sentences will not be disturbed.

We affirm the judgment of the circuit court of Cook County.

Affirmed.