**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210487-U

Order filed April 26, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Tazewell County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Appeal No. 3-21-0487 Circuit No. 19-CF-362 |
| ANTHONY D. BETSON, | ) ) | Honorable Paul Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Brennan and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The trial court did not err when it denied defendant's motions to suppress evidence where police were dispatched to the home, their entry into the home was justified, and they received the homeowner's consent to search the bedroom after observing suspected drugs in plain sight.

¶ 2     Defendant Anthony Betson was convicted of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)) and possession of methamphetamine with intent to deliver (720 ILCS 646/55(a)(1) (West 2018)) and sentenced to concurrent terms of seven years'

imprisonment. On appeal[1], he argues the trial court erred when it denied his two motions to suppress evidence, where police conducted a warrantless search of his grandmother's home without consent or exigent circumstances to justify the entry. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Pekin police were dispatched to defendant's grandmother Linda Betson's residence based on a call reporting an individual refusing to leave. Officers arrived on scene and observed a man, Linda's neighbor James Thorne, holding the front door open, telling police, "He's in there." Once inside, the police saw Linda, who gestured toward a bedroom. The police approached the bedroom and saw defendant and his girlfriend inside, and a bag of suspected methamphetamine on the floor. The police arrested defendant's girlfriend on an outstanding warrant. When the police asked who the bag belonged to, defendant answered it belonged to him, and he was arrested. After both were arrested and removed from the home, the police reentered and asked Linda for consent to search the bedroom, which she reportedly granted. During this search, police found multiple plastic baggies containing suspected methamphetamine, a pistol, and ammunition. Defendant was charged with possession of a weapon by a felon and possession of methamphetamine with intent to deliver. Before trial, he filed two motions to suppress evidence, which were denied.

¶ 5                      A. Defendant's First Motion to Suppress Evidence

¶ 6        Defendant's first motion to suppress alleged the police entered the home without obtaining permission from anyone who had even apparent authority. Linda denied giving permission for police to enter the home to conduct a search. At the hearing on the first motion to suppress, Linda

_____

[1] We note here that the cover page of defendant's brief identifies the incorrect appellate and circuit courts. See Ill. S. Ct. R. 341(d) (eff. Oct. 1, 2020) (setting forth what should be included on a brief's cover page). We caution the parties to check for accuracy when using templates.

testified defendant lived with her in her home from March 2019 until his arrest in June 2019. She called her son, John Betson, to tell him defendant's girlfriend was in the house, and she did not want her there. She also told John to not call the police. The police arrived at approximately 10 p.m. There was more than one officer, and she did not speak to any of them. The police did not talk to her before entering the home, and they did not ask her for permission to search the home. The first thing she said to police that night was, "Why are you taking my grandson?" She testified defendant was nice to her, has never hit or swore at her, and she was not afraid of him.

¶ 7        Officer Justin McKinley testified he was the first officer to arrive at Linda's home. He was called to the residence for a disturbance involving a man and woman who refused to leave. When he arrived, he saw Thorne, who had heard a commotion inside the house, standing in the doorway and talking to someone inside. At the time, McKinley did not know who this man was, but he believed Thorne did not live at the home. McKinley asked Thorne what was happening. Thorne pointed in the house and said, "He's in there." McKinley entered the home and saw Linda standing in the living room. He asked her what was happening, to which she made a motion, pointing her hand toward a bedroom. Linda did not say anything and appeared very upset. McKinley saw defendant and his girlfriend inside the bedroom, and he also saw suspected methamphetamine on the floor. Defendant said it belonged to him, and the officers removed both defendant and his girlfriend from the home. McKinley walked back into the house to ask Linda for her consent to search the bedroom. He told her, "I found some things in the bedroom that were suspected drugs. Can I search the room?" He testified Linda's exact response was, "Yes. Get it out of there."

¶ 8        Detective Justin Fitzgerald testified he listened to a video jail visit between defendant and Linda during which they discussed details of the arrest and referenced the firearm. The video was transcribed because defendant and Linda spoke English and Spanish. During this visit, Linda said,

3

"I'm scared of everything you do to me. You know what you do to me. I'm scared." Later during the conversation, Linda said, "That's not a reason to hit me," and defendant responded, "Shut the f*** up." Defendant then told her,

"You're going to die while I'm in prison. You're going to die. No more kisses, no hugs, nothing. It's all over. It's not my fault! I would've just left. I was packing up and leaving. I was leaving the house. I don't get why the f*** the cops came. Except for my b*** uncle who, I don't give a f***, they can record it right now, I see that m*** again, I'm shooting him!"

Defendant ended the visit by asking his grandmother for money.

¶ 9        The court denied the motion to suppress. In its ruling, the court stated,

"Linda also said, get it out of there, and the drugs were in plain view when he entered into the room, and the court has considered the exigent circumstances, and there is certainly enough reason for [Officer McKinley] to have entered the house, and again, I want to make it clear that whether Mrs. Betson gestured or she didn't, that there was enough for the police to go in there."

¶ 10                    B. Defendant's Second Motion to Suppress Evidence

¶ 11        Defendant's second motion to suppress evidence was largely similar to the first motion, except it was based on his uncle, John Betson's, testimony. During the hearing, John testified he was defendant's uncle and Linda's son. According to John, his relationship with defendant was tense, and defendant did not treat Linda well, as he was manipulative, violent, and disrespectful. Linda called him because she wanted defendant's girlfriend to leave the house. John called the Pekin police department to remove defendant's girlfriend. By the time John arrived at Linda's house, the police were already there, and defendant was in a police car. John testified McKinley

4

asked him if police could search the bedroom, and John answered, "Sure." McKinley never asked if he lived in the house. John never heard Linda give anyone permission to search the bedroom or the house.

¶ 12    McKinley's testimony at the second hearing was similar to his testimony at the first hearing. He added that he interpreted the call ticket from dispatch as someone in Linda's house refusing to leave, but he did not know at the time if it involved a physical or verbal altercation. According to McKinley, John arrived as the officers were leaving the residence, after they had searched the bedroom. McKinley never asked John for consent to search the bedroom. He also added that Linda was upset about defendant's arrest, but her demeanor changed to frustration when she learned there was contraband in the house.

¶ 13    Officer Alison Palmer testified she also responded to the call. McKinley was already inside the house when she arrived. When she walked into the bedroom, she saw the bag of suspected methamphetamine on the floor. She heard the conversation between McKinley and Linda. McKinley asked Linda for consent to search the bedroom. According to Palmer, the officers did not specifically tell Linda they were going to search the room; rather, it was implied. Palmer could not remember Linda's exact words but recalled Linda was upset there was contraband in the house and told the officers she wanted everything illegal out of the house. Based on this statement, Palmer and McKinley searched the bedroom and found more contraband.

¶ 14    Palmer also testified John arrived after police already searched the room and were clearing the scene. McKinley did not ask John for consent to search the bedroom; all the evidence was already collected by the time he arrived.

¶ 15    Defendant testified he lived with his grandmother part-time, on and off. The door to his bedroom was not on the hinges; it was propped against the wall. He still expected this room to be private from others.

¶ 16    The court denied defendant's second motion to suppress in a written order. The court specifically found a warrantless entry was justified due to exigent circumstances. The court also found Linda's consent was appropriately given and not coerced by police.

> "If anything, Linda Betson was under the duress of the defendant and she thus voluntarily (and welcomed) the police to search the bedroom and remove any contraband. Stated another way, the second 'search' of the bedroom was not inextricably bound with any improper assertion of authority by the police. Linda Betson's words and actions were a voluntary relinquishment of her right to refuse a further search."

¶ 17                        C. Stipulated Bench Trial and Sentencing

¶ 18    After a stipulated bench trial, the trial court found defendant guilty of unlawful possession of a weapon by a felon and unlawful possession of methamphetamine with intent to deliver. The court denied defendant's motion for a new trial and sentenced him to concurrent terms of seven years' imprisonment. This appeal followed.

¶ 19                                    II. ANALYSIS

¶ 20    On appeal, defendant contends the trial court erred by denying his motions to suppress. He argues the police did not have consent to enter his grandmother's home, and their warrantless entry was not justified under either the exigent circumstances or community caretaking exception to the warrant requirement. Further, he maintains the police did not have Linda's consent to search the bedroom after he was removed from the house.

¶ 21 This case thus requires us to consider the propriety of both the police's initial entry into the home and their search of the bedroom after defendant was removed. For the reasons stated below, we conclude the officers' warrantless entry was justified under the community caretaking exception to the warrant requirement. Therefore, we need not address whether exigent circumstances justified the officers' entry. See *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 37. We further conclude Linda consented to the search of the bedroom. Accordingly, we affirm the trial court's denial of defendant's motions to suppress.

¶ 22                                    A. Standard of Review

¶ 23 A court reviewing a motion to suppress evidence, although using a *de novo* standard, will give great deference to the trial court's factual findings and will not reverse those findings unless they are against the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006).

¶ 24                                    B. Forfeiture

¶ 25 As an initial matter, defendant concedes he did not include the issue of the trial court's denial of his motions to quash in his motion for a new trial. "To preserve an issue for review, a party ordinarily must raise it at trial and in a written posttrial motion." *People v. Cregan*, 2014 IL 113600, ¶ 15. However, three types of claims are not subject to forfeiture for failure to file a posttrial motion: (1) constitutional issues that were properly raised at trial and may be raised later in a postconviction petition; (2) challenges to the sufficiency of the evidence; and (3) plain errors. *Id.* ¶ 16. In the interest of judicial economy, we will consider the issue despite defendant's failure to raise it in his posttrial motion. See *Id.* ¶ 18.

¶ 26                                    C. Police Entry into the Home

¶ 27                                    *1. Consent to Enter the Home*

¶ 28          We first address whether police had consent to enter the home. The fourth amendment guarantees the right of an individual against unreasonable warrantless searches and seizures of their houses and effects. U.S. Const., amend. IV. The fourth amendment's prohibition against the warrantless entry of a person's home does not apply to situations in which voluntary consent has been obtained either from the individual whose property is searched or from a third party who possesses common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). "Under the common-authority rule, a defendant assumes the risk that someone with joint access or control over property has the right to permit a search of it." *People v. Baker*, 2021 IL App (3d) 190618, ¶ 23. Common authority may be actual or apparent. *Id.* Under the apparent authority doctrine, a warrantless entry does not violate the fourth amendment where police reasonably believed the individual granting consent had common authority over the premises. *Rodriquez*, 497 U.S. at 188-89. But if facts do not support the reasonable belief that the consenting party had authority over the premises, then warrantless entry without further inquiry is unlawful. *Id.* An individual "may convey consent to search by nonverbal conduct, but mere acquiescence to apparent authority is not necessarily consent." *People v. Anthony*, 198 Ill. 2d 194, 202 (2001). "Compelled compliance may be shown by: (1) the presence of several police officers; (2) the display of a weapon; (3) an officer's physical contact with the citizen; and (4) an officer's use of language or tone of voice commanding compliance." *People v. Robinson*, 368 Ill. App. 3d 963, 973 (2006).

¶ 29          Here, police were dispatched to Linda's home in response to a call requesting police services. Thorne, a neighbor, held the door open, allowing police to enter the home. Officer McKinley testified he did not believe Thorne lived at the house, and he therefore could not

8

reasonably believe Thorne had authority over the premises. When McKinley entered the home, he asked Linda about what was happening, and she gestured toward defendant's bedroom. She did not tell police to leave. She was in the living room near the front door when they arrived. There is no evidence that she was surprised by their arrival. The trial court reasonably found Linda's testimony that she did not give police permission to enter incredible, because she also said she was not afraid of defendant and he never hit or swore at her, which was flatly contradicted by her discussion with defendant during their video jail visit. Moreover, even though there were multiple uniformed officers in Linda's home, they did not draw their weapons on her, and the record does not suggest police spoke to Linda in a tone of voice commanding compliance. She was not surrounded by police because McKinley arrived first and approached her alone. After their initial entry, Linda consented to police presence in her home. However, we must still determine whether the police's initial warrantless entry was justified under some exception to the fourth amendment's warrant requirement.

¶ 30                    *2. Community Caretaking Exception to the Warrant Requirement*

¶ 31             "The 'community caretaking' doctrine is analytically distinct from consensual encounters and is invoked to validate a search or seizure as reasonable under the fourth amendment." *Luedemann*, 222 Ill. 2d at 548. "The challenge of [the] community-caretaking doctrine is to permit helpful police to fulfill their function of assisting the public, while ensuring that searches for law-enforcement purposes satisfy the requirements of the Fourth Amendment." *People v. McDonough*, 239 Ill. 2d 260, 272 (2010). To qualify under this exception, (1) law enforcement officers must be performing some function other than the investigation of a crime, and (2) the search or seizure must be reasonable because it was undertaken to protect the safety of the general public. See *Id.* "Reasonableness, in turn, is measured in objective terms by examining the totality of the

9

circumstances." *Id.* "An individual's interest in proceeding about his business unfettered by police interference must be balanced against the public's interest in having police officers perform services in addition to the traditional enforcement of penal and regulatory laws." *Luedemann*, 222 Ill. 2d at 547. "An officer performs as a 'community caretaker' if his purpose in questioning the defendant was totally divorced from detection, investigation, or acquisition of evidence." *Robinson*, 368 Ill. App. 3d at 972.

¶ 32        Defendant argues the community caretaking exception does not apply because the officers had no reason to believe there was an emergency requiring their immediate aid. The State argues Officer McKinley was permitted to enter pursuant to the community caretaking exception or public safety purpose based on the facts he was provided. The State notes Thorne was waiting for police and holding the door open, which signified the events inside the house were significant enough for an unrelated neighbor to also become involved.

¶ 33        The State argues this case is similar to *People v. Hand*, 408 Ill. App. 3d 695 (2011). In *Hand*, the defendant's husband reported to police his concerns about his wife and children inside the apartment. An exigent circumstances analysis was not appropriate under the facts of that case because police were not attempting a warrantless entry into the defendant's home to arrest a crime suspect, but instead were seeking to inquire about the children's welfare. *Id.* at 700. But police entry based on the community caretaking exception was reasonable. "Our courts have recognized that the community caretaking exception is necessary for the public's protection when a police officer objectively and reasonably believes there is a need to seek information about an individual's well-being." *Id.* at 703.

¶ 34        We conclude the officers' warrantless entry into Linda's home was reasonable under the community caretaking exception. Here, the police were not investigating a crime or collecting

10

evidence, but rather they were responding to a dispatch for police service. See *Robinson*, 386 Ill. App. 3d at 973 (police officer's motive for approaching defendant was not to investigate a crime, but to respond to a 911 well-being call). John called the police on behalf of his mother. The police went to the house with limited information and only knew there was a disturbance. They did not know whether the disturbance was verbal or physical. Their entry was therefore justified to gather information regarding the purpose of the call. Because police responded to a call that they had little information about, it was reasonable to believe their services were necessary to protect the public. Accordingly, the police's initial entry was justified under the community caretaking exception. And because Linda consented to their continued presence after the initial entry, the trial court did not err by denying defendant's motion to suppress.

¶ 35                               D. Police Search of the Bedroom

¶ 36        Defendant also argues Linda did not provide consent for the police to search defendant's bedroom, and there were no exigent circumstances justifying the warrantless search. The State argues Linda provided consent for the bedroom search when she told the officers she wanted everything illegal removed from the home. We agree with the State.

¶ 37        Consent to search is an established exception to the requirements of a warrant and probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "The voluntariness of the consent is a question of fact determined from the totality of the circumstances, and the State bears the burden of proving the consent was truly voluntary." *Anthony*, 198 Ill. 2d at 202. "Consent is determined by whether a reasonable person would have understood—by an individual's words, acts, or conduct—that consent had been granted." *People v. Burton*, 409 Ill. App. 3d 321, 328 (2011).

¶ 38        The trial court found Linda gave consent to search the bedroom, and this finding was not against the manifest weight of the evidence. Linda's testimony that she was never asked for

11

permission to search the bedroom was contradicted by both McKinley and Palmer. McKinley testified he told her they saw suspected drugs on the floor, and both McKinley and Palmer testified Linda wanted it all out of her house. McKinley also testified Linda became frustrated when she learned of the suspected drugs. Further, there is nothing in the record to support the contention that her consent was involuntary. Instead, the jail phone call and video visit with defendant show a grandmother who is fed up with her grandson's actions. She knew defendant's history, and when she learned he brought contraband into her house, she wanted the contraband removed. She told McKinley to get it "all" out. And though Palmer could not remember Linda's exact words, she also understood Linda as wanting all contraband removed from the home. Based on Linda's statement that she wanted "all" of the contraband out of her house, the officers reasonably understood that Linda had consented to a search to find and remove the contraband. *Id.* The trial court's finding of valid consent was not against the manifest weight of the evidence.

¶ 39     Because we agree with the trial court's finding that Linda granted consent for police to search the bedroom for contraband, we need not address the issue of whether the police search was justified by exigent circumstances. The court properly denied defendant's motions to suppress.

¶ 40                                   III. CONCLUSION

¶ 41     For the reasons stated, we affirm the judgment of the circuit court of Tazewell County.

¶ 42     Affirmed.