NOTICE
Decision filed 09/05/19. The
text of this decision may be
changed or corrected prior to
the filing of a Petition for
Rehearing or the disposition of
the same.

2019 IL App (5th) 180336

NO. 5-18-0336

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 17-CF-286 |
| | ) | |
| ERICA L. WOODS, | ) | Honorable |
| | ) | Zina R. Cruse, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court, with opinion.
Justices Chapman and Barberis concurred in the judgment and opinion.

**OPINION**

¶ 1    The State appeals the order of the circuit court of St. Clair County that granted the motion to suppress evidence filed by the defendant, Erica L. Woods. For the following reasons, we reverse and remand for further proceedings.

¶ 2                                      I. BACKGROUND

¶ 3    The facts necessary to our disposition of this appeal follow. On March 10, 2017, the defendant was charged, by criminal complaint, with one count of causing child endangerment, a Class 3 felony. The complaint alleged that, on or about March 9, 2017, the defendant "willfully caused and/or permitted a male minor with initials A.S. and date of birth [in December 2016] *** to be placed in circumstances that endangered the child's life or health in that said defendant left the minor child unattended and alone in" a residence in O'Fallon. The complaint further alleged

1

that the defendant had previously committed child endangerment in a different St. Clair County case in 2015. On March 24, 2017, the defendant was indicted on the same charge in an indictment that made allegations substantially similar to those in the criminal complaint.

¶ 4   On July 19, 2017, the defendant filed a motion to suppress evidence, in which she contended, *inter alia*, that an officer "entered the curtilage of the home and looked in a bedroom window" and that after she and her boyfriend arrived at the home and entered it, "police officers followed them inside." She alleged that the actions of the officers, which occurred without "an arrest warrant or a search warrant," violated the defendant's constitutional rights. She asked, as relief, that the trial court enter an order suppressing "all items seized, any and all observations by law enforcement personnel, and statements, admissions, and confessions of the defendant" and that the court forbid "their entry into evidence against her at trial due to the unlawful nature of the search and seizure."

¶ 5   On October 31, 2017, a hearing was held on the defendant's motion. The first witness called by the defendant in her case-in-chief was Adam Sneed, who testified that he had lived in the O'Fallon residence in question—which he testified was a three-bedroom, single-story home—for 16 years. Sneed testified that "to the left" of the house there was a six-foot wood fence, with a gate to allow access from the front yard to the back yard. Sneed testified that the gate was kept secured, so that his dog could not get out, with a "bungee cord tying it down, on top of a hanger that holds it closed, as well, and logs that keep it shut." The gate opened inward to the back yard, but the logs were placed in the back yard to keep it from opening from the front yard. To open the gate, Sneed first would have to enter the back yard from the "slide door of the house," then remove the logs. Sneed testified that the only way to access the back yard without going through the house would be "jumping the fence." Sneed testified that on the right side of his house, a chain-link fence, approximately four feet tall, connected his house to his neighbor's house and that a similar

2

fence was "on the back side" of his house. He testified that to gain access to the back yard, one could jump this fence as well.

¶ 6     Sneed testified that on March 9, 2017, he arrived home at approximately 11:30 p.m. to find "four or five" police cars, and approximately the same number of police officers, outside his home. Sneed testified that shortly before arriving home, he had received a phone call from someone who identified himself as Officer Adamson of the O'Fallon Police Department and who told Sneed the police had "reason to believe that you guys have left your minor at home alone." He testified that he and the defendant were together at the time, and resided together at the home. Sneed testified that he tried to tell the police they had received a "falsified report," but that the officers "weren't trying to hear anything I had to say." He testified that he told the officers they "should actually investigate the people who made this report because it's not true" and immediately thereafter testified that he "proceeded to go *** into" the house. When asked if he continued his "conversation" with police, or terminated it, Sneed testified that he terminated it. When asked how he terminated it, Sneed testified, "Tried to go in my house. *** Well, I did go into my house." He testified that a police officer followed him in, although he did not invite the officer in. He testified that the officer did not give "any indication of why he was entering [the] house."

¶ 7     When asked how many officers entered the house at that time, Sneed testified, "Three, at the most." He testified as to the layout of his home. When asked if the officers remained in the living room after following him into the house, Sneed testified that they did not and that the officers "followed me to the back of the house, which is where the baby was." He clarified that two of the three officers followed him and that the other officer remained "in the walkway," while the fourth officer remained outside with the defendant. He testified that the officers did not search the house, or look for anyone else in it, and that when they reached the infant's room, the infant was asleep in a bassinet. He testified that the blinds on the room's window were "definitely closed" and that

3

therefore no one would have been able to see the bassinet from outside the house. He clarified that the window was located in his back yard. When asked if he knew the complainant in this case, Sneed testified that he did and that the complainant knew Sneed had a dog. Sneed testified that there was no emergency in the house, such as "smoke or anything like that."

¶ 8    On cross-examination, Sneed conceded that the defendant, rather than Sneed, was the last person in the infant's room before they left the house on March 9, 2017. Sneed testified, however, that he was "sure" the drapes[1] were drawn in the infant's room because the defendant "does not touch the drapes." Sneed testified that the complainant had threatened to call the police on the defendant, regarding leaving the infant at home alone, "to get her life messed up, in general." He conceded that when the police arrived, the infant was in fact at home alone. He conceded that the police told him they had first gone to the house "45 minutes prior," and had knocked on the door, but that no one had answered.

¶ 9    The next witness to testify was Officer Daniel Hesselbacher of the O'Fallon Police Department. He testified that at approximately 10:41 p.m. on March 9, 2017, he received a dispatch of "an unattended child in a residence. Had a witness that stated there was an infant inside a residence, by itself." He arrived at the residence and "parked directly in front of the residence." Hesselbacher testified that he was the first officer to arrive on the scene and that "probably within less than a minute, Officer Adamson arrived." He testified that he checked the area to see if there were any vehicles parked outside, which there were not, and "stayed on the sidewalk until Officer Adamson arrived. Didn't approach the house at all." He testified that once Adamson arrived, he

---

[1]It is not clear from Sneed's testimony, or from the questioning of Sneed by the parties and the trial judge, whether the window had both blinds (as Sneed testified on direct examination) and drapes (the term used by the State in questioning Sneed on cross-examination and used independently by Sneed on cross-examination as well) or if Sneed and the parties were using the terms "blinds" and "drapes" interchangeably during Sneed's testimony. See the subsequent testimony of additional witnesses for partial clarification.

4

"looked from the outside" and could see through the front window that, despite the lack of vehicles in the driveway, there were "interior lights turned on in the house." He testified that he believed the front window had both blinds and drapes and that "you could partially see the light coming through part of" the blinds. He did not see anything else, or hear anything, while standing there. He testified that he then went to the front door and knocked on the door "probably five to six times" and rang the doorbell. Again he did not see or hear anything from inside the house. He "waited a couple of minutes," then knocked again, this time using part of his flashlight against the door "in case there was somebody inside who may have been sleeping, to make [sure] that the knock was going to be heard." He testified that he left the residence "approximately 12 to 13 minutes after arrival." In addition to knocking on the door, he and Adamson "both went around to the—the front window to see if we would see anything. Didn't see anything out of the ordinary." Hesselbacher testified that he then went to the right side of the house and tried to look into the two windows on that side of the house, which he testified he could access from the front yard without being "impeded" by the fence.

¶ 10    Hesselbacher was then asked what information he had been given by dispatch when he first received the call. He testified he had been told "the reporting party had gone up to the house. They were supposed to meet some friends there. And they had no contact. And they heard a baby crying. And that they had gone to a—one of the side windows of the house, and that they had seen— actually seen the baby inside there." Hesselbacher testified that he was given the name of the complainant and agreed with defense counsel that dispatch did not "[i]nitially" characterize the complaint "as an anonymous tip." Hesselbacher agreed that he "did not cross any fencing" on his first visit to the residence that night, and instead "just looked and listened and paid attention to [his] surroundings." He testified that there was nothing that caused him alarm at that point. Adamson departed the scene, and he stayed to type up notes stating "basically that we responded

out and we didn't find anything out of the ordinary." As Hesselbacher thereafter departed the scene, he "was flagged down by a citizen," who stated that he was the complainant and asked why the officers were leaving. Hesselbacher testified that he told the complainant that the officers "would come back and check in a while, again, to see if we heard anything," but that at the moment, there was "no reason to continue an investigation. We didn't find anything out of the ordinary." Hesselbacher testified that the complainant "was very adamant about, that there was a child in the house by itself." Hesselbacher asked the complainant if he had seen the child and then told both dispatch and his supervisor that the complainant "was adamant that—that [the child] was still in there by itself." Hesselbacher testified that he explained to the complainant that officers "had gone as far as [they] could *** without intruding into the back yard," which they had not done earlier because they had not "heard anything at that time." Hesselbacher testified that the complainant wanted police to enter the back yard because the window in the back yard was the window through which "the child was visible."

¶ 11    Hesselbacher testified that he and Adamson returned to the house, approached the front of the house, near the wooden fence on the left side, and "listened again." They verified that the large dog they had seen earlier in the back yard was still there. Hesselbacher testified that the complainant, who had said the dog knew him and that he would take care of the dog while the officers entered the back yard to see the infant through the window, opened the gate. When asked how the complainant opened the gate, Hesselbacher testified, "I honestly don't remember how he opened the gate, but there was no locks or anything attached to the gate, itself." Hesselbacher testified that the complainant "basically got ahold of the dog somehow, and was kind of petting it and telling him, you know—obviously, the dog knew him. He was very comfortable with him." Hesselbacher then entered the back yard. He agreed that he still did not hear or see anything out of the ordinary at this point. The complainant directed Hesselbacher to the window, which

Hesselbacher looked into. He testified that a large-screen TV was turned on in the room. He testified that the bottom of the window was "approximately three and a half to four feet" off the ground. There were blinds on the window but "the bottom part of the window was not covered." He could not recall if there was "a shade" or "any drapes or curtains" on the window. Hesselbacher testified that he did not look into any other windows. The only light in the room was from the TV. He could see "a small crib" and "a foot moving" in the crib. He testified that it was not "a quick movement" but "was sustained movement. The foot was up, and moved a couple different times." He testified that Adamson, who had followed him into the back yard, also looked into the window. Thereafter, Hesselbacher stayed by the window for "probably another five to ten minutes," while Adamson again went to the front door and knocked on it. Two additional officers, Sergeant Mojzis and Officer Lampe, arrived at some point.

¶ 12    Hesselbacher testified that by the time Sneed and the defendant arrived, the complainant had left, to go to the police department to make a statement. Hesselbacher testified that he was still in the back yard, monitoring the window to make sure nothing happened to the infant, when Sneed and the defendant arrived. He was instructed by Mojzis to come to the front of the house, and did so, through the wooden gate again. He did not remember seeing any logs by the gate or tripping over them. Eventually, "it was decided to—to get inside, to go into the house to check on the welfare." When asked who decided they would go inside, Hesselbacher testified that Sneed was "trying to get inside the house. And from previous encounters, we know that he has a valid FOID card, and that he does keep a pistol near the front door, inside of the residence." He testified that he did not recall asking Sneed or the defendant for "consent to come into their home." He agreed that at this point he still did not "hear a baby crying" or anything else "out of the ordinary." He testified that he followed Sneed into the house, then to the infant's bedroom. He did not ask consent to follow Sneed but did so "[f]rom an officer safety issue." Hesselbacher added, "He moved very

7

quickly." When asked if he looked into other rooms as he followed Sneed to the infant's bedroom, he testified that he was "glancing quickly, just to ensure there was nobody inside there." He agreed that he was "investigating" to see if any other adults were in the home. He agreed that the complainant did not live at the home and did not have any authority to allow officers into the back yard.

¶ 13 On cross-examination by the State, Hesselbacher testified that Sneed told him that Sneed knew who called the police and that the call was "false." He agreed that when he walked through the house following Sneed and glanced into the rooms along the way, he was doing so both for officer safety purposes and "to determine if anyone else was in the house." When asked why he "walked back with Mr. Sneed to see the baby," he testified, "Just to ensure the child was safe, and there wasn't—no medical issues, anything like that." He did not believe Sneed was "under the influence or anything like that." He testified that when he looked into the two windows on the right side of the house, "the blinds were drawn on both of those rooms," and he could not see anything inside.

¶ 14 The next witness to testify was Officer Michael Adamson of the O'Fallon Police Department. His testimony about the layout of the home, and the events that night, was substantially similar to that of Hesselbacher, although he did not remember Hesselbacher knocking on the front door and did not think Hesselbacher had remained at the back yard window when Adamson returned to the front of the house to knock again. With regard to interacting with Sneed and the defendant, Adamson testified that Sneed told the officers that Sneed was going to go inside the house and that Adamson entered the house too. He testified that he did not ask consent to enter and did not hear any other officer ask but that he "didn't hear the full conversation." He did not go farther than the kitchen, which was past the living room. When asked why he entered the house, Adamson testified, "To help provide security and allow Officer Hesselbacher to speak with Mr.

8

Sneed while he was inside his house." He did not see a gun in the house but was "[a]ware of the possibility of Mr. Sneed having a gun in his living room" because Sneed had told Adamson on a previous call to the home that Sneed had a gun that he kept, for Sneed's protection, near the front door. When asked if at any point during the night he saw anything at the residence that alarmed him, Adamson testified, "A child, approximately two to three months old, in the house. Didn't appear to be in distress. However, we weren't able to see or contact any adults in the house."

¶ 15   Michael Mojzis then testified that he was a patrol sergeant with the O'Fallon Police Department. He testified that he believed he arrived at the house "about 20 minutes after the call" was received but that he was not certain, and the time was not noted in his police report. At no point did he enter the back yard of the home. He was in the front yard when Sneed and the defendant arrived. He explained to Sneed that the officers wanted to enter the home to check on the infant. Sneed did not give him consent to enter the home, and neither did the defendant. He did not recall Sneed saying that Sneed knew who the complainant was or that the complaint was false. Mojzis testified that he entered the house after Hesselbacher did but remained in the "[f]oyer, living room, hallway" areas.

¶ 16   The next witness to testify was the defendant. Her testimony about the layout of the house, and the fencing around and near it, was in many ways similar to that of the other witnesses. She testified that the logs used to secure the wooden fence gate had been there as long as she had lived there, which she testified was approximately two years, and were still there as of the date of the hearing. However, she testified that there were no windows on the right side of the house, only the left side and the back of the house. With regard to the room the infant was found in, she testified that it had "blinds, and also a purple curtain, a dark purple curtain over the window," which she testified "blocks out the light." She testified that the blinds were typically kept down and that she did not "really touch the windows or blinds in that room." She believed that on the night in question

9

the blinds were down and the curtains were closed. She testified that "four or five" police officers were at the home when she and Sneed arrived but that she did not have a conversation with any of the officers. She was not asked for consent for anyone to enter the home, and she did not offer it.

¶ 17     On cross-examination, the defendant reiterated that she believed the blinds were down and completely closed on March 9, 2017. She testified that the window of the infant's room was on the left side of the house, rather than the back of the house, but agreed it was inside the fence. She testified that, to her knowledge, the complainant had never been in the back yard of the home "at all," although she agreed that he had been to the home and "knows [the] dog." Following the defendant's testimony, the defense rested. The State announced that it wished to call the complainant because he might "be able to clear up some issues about the visibility and the window, and how he opened the gate, or if he had trouble opening the gate." Over the defendant's objection, the trial judge entered an order allowing for further hearing, at which the State could call its additional witness.

¶ 18     A little over two weeks later, on November 16, 2017, a second hearing was held. The defendant requested permission to reopen her case "for the sole purpose of admitting various photographs into evidence." Permission was granted. Thereafter, the defendant authenticated seven photographs, which she testified depicted the exterior of the home in question and had been taken within the last two weeks. Digital copies of the photographic exhibits are included in the record on appeal in this case and have been viewed by this court. Upon questioning by the trial judge, the defendant testified that the exhibits reflected "the same condition the house was in on" the night in question. The trial judge then stated that she would "have to hear from the officers." The defendant thereafter reclosed her case-in-chief, and the State opened its case.

¶ 19     The first witness to testify for the State was Adam Bieri, who testified that he was the complainant who reported the defendant and Sneed to police for leaving the infant unattended. He

10

testified that he and his girlfriend had planned to "hang out" with Sneed and the defendant, who had told Bieri they were at "the bar" and wanted Bieri and his girlfriend to "come up." However, once he and his girlfriend were ready to go, they were unable to contact Sneed and the defendant, so Bieri went to the home and knocked on the front door and rang the doorbell. Bieri testified that "after standing there for two or three minutes and trying to listen," he heard what he believed "was a faint baby crying," which "sounded like a little crying out." He knew Sneed and the defendant had an infant child, so he "investigated farther [*sic*]" by walking around the side of the house, "at which time [he] saw the baby in a window." When asked how he got into the back yard, he testified, "I let myself in the unlocked gate." When asked if he recalled "any item used to barricade the gate or keep the gate from moving," he testified, "Not at all."

¶ 20     Bieri testified that he knew the dog in the back yard and was not afraid of it. He was able to see into the room the infant was in, which was on the left side of the house, because even though the window had "slatted blinds," the blinds "were open." He testified that he "did not see a drape" but that if there was one, "it was pulled to the side so that it wasn't covering the window." Bieri testified "there was a night light of some sort, a small, dim light, and the TV was on" in the room. He testified a cartoon he did not recognize was on the TV. He saw "a crib directly in front of the window" and the infant in the crib, "crying initially." He testified that "by the end there, [the infant] was just kind of rolling around, just laying there." He testified he could see "[t]he whole baby" and that once he saw the infant, he "immediately left and went to call." He estimated that he looked in the window for "[f]ifteen seconds." He testified that after calling the police, he "waited a couple houses down." When he saw the two officers who responded leaving after looking in the front window only, he flagged one officer down and told the officer he was the complainant.

¶ 21     Bieri testified that the police "tried to clarify that I had actually seen with my own eyes, and where did I see it, could I show them." He testified that after he told his story to police a second

time, "they said, 'Well, can you show us?' " He testified that he agreed to show them. Bieri testified the police asked him to hold the dog while they looked, which he agreed to do. He testified that he, rather than the police, opened the gate and that he watched "as they looked in the window." He testified that, thereafter, they asked him to return to his car and wait, after which they asked him to go to the police station and give a statement. With regard to his general relationship with Sneed, Bieri testified that he had known Sneed for approximately two years but that by March 9, 2017, they "had become estranged." He testified that "at that time, actually, they were trying to get us to become friends again. That was the purpose of them calling us to hang out." Bieri was shown the various photographic exhibits and testified that he did not remember "ever seeing logs in the back yard."

¶ 22     On cross-examination, Bieri testified that he believed the doorbell was working and recalled hearing the doorbell sound within the house after he rang it. He denied having "animosity" toward the defendant or Sneed but testified that they were "not the character or class of people we decided we wanted to associate with anymore." Following Bieri's testimony, the trial judge asked counsel for the defendant what her position was. Counsel answered that she believed police "didn't have a legal right to enter the curtilage or to follow Mr. Sneed into the home." The trial judge subsequently asked if counsel for the State wished to call one or more police officers to testify, in light of the photographic exhibits. Counsel indicated that she did, and the matter was set for a third hearing.

¶ 23     On December 6, 2017, the third hearing was held. Officer Hesselbacher was resworn and was the only witness called at the hearing. Hesselbacher testified that after viewing the photographic exhibits, he agreed that there were no windows on the right side of the house and that he was mistaken in his earlier testimony that there were. He testified, as he had before, that Bieri was the one who opened the gate to the back yard. He agreed that, based on the photographic

exhibits, the window he looked in to see the infant must have been on the left side of the house, rather than in the back. He testified that he did not recall any logs such as those shown in the photographic exhibits being present and did not recall Bieri having any trouble opening the gate. The defendant did not cross-examine Hesselbacher. In argument, the defendant's counsel pointed out the inconsistencies in the testimony of the officers with regard to "the basic facts of this case." She then discussed the case law that she believed was relevant to her motion. The State acknowledged the inconsistencies in testimony. The State argued, however, that the actions of the officers were appropriate and "that they were acting in good faith, and that they were in a community caretaking capacity." After the hearing, the trial judge took the matter under advisement.

¶ 24    On May 22, 2018, the trial judge entered an order in which she found that (1) officers admitted that they entered the curtilage of the defendant's residence without a search warrant, (2) "[t]he evidence also revealed that the police *** received a tip that an infant had been left alone in the residence," (3) although "the tip was actually valid," for a warrantless search to be permissible, "exigent circumstances must exist," (4) the police acted diligently "in their attempt to ascertain whether exigent circumstances existed when they knocked on the door and listened for any sound(s) of distress or safety concerns," and (5) a "further search of the residence/curtilage was not within the purview of a justifiable warrantless search." The trial judge then memorialized her concerns about the ramifications of following existing case law in a case such as this one, noting that an infant could be "silently choking or in the distress of the silent killer, sudden infant death syndrome." Her concerns notwithstanding, the trial judge ruled that the motion to suppress must be granted under existing law. The trial judge did not address the issue of whether the police were acting in a community caretaking capacity. The State filed a notice of appeal, along with a certificate of impairment. This timely appeal followed.

13

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, the sole argument made by the State is that the trial judge erred when she granted the defendant's motion to suppress because, according to the State, the officers acted appropriately, in accordance with their community caretaking role. The State concedes on appeal that the officers "entered both the defendant's home and the curtilage of that home without a warrant" and that "their actions were not motivated by a belief exigent circumstances existed to justify the warrantless entry." The defendant, on the other hand, contends that the community caretaking doctrine is not applicable to the facts and circumstances of this case, as described in more detail below.

¶ 27    We begin our analysis of the arguments made by the parties on appeal by examining our standard of review. As the Illinois Supreme Court has noted, a reviewing court in Illinois applies a two-part standard of review when considering the propriety of a trial judge's ruling on a motion to suppress evidence. *People v. Cosby*, 231 Ill. 2d 262, 271 (2008). We review the trial judge's findings of historical fact for clear error only, and we give the appropriate weight to any inferences drawn from those facts by the trial judge as the finder of fact. *Id.* This means that we afford great deference to the trial judge's factual findings and may reverse those factual findings only if they are against the manifest weight of the evidence. *Id.* We are nevertheless free to undertake our own assessment of the facts as they relate to the issues raised on appeal, and we therefore may draw our own conclusions with regard to what relief should be granted. *Id.* As a result, our review of the trial judge's ultimate legal ruling on the motion to suppress evidence is a *de novo* review. *Id.* As we conduct our analysis, we remain mindful of the fact that it is the defendant, not the State, who bears the burden of proof on a motion to suppress. See, *e.g.*, *People v. Cregan*, 2014 IL 113600, ¶ 23. If the defendant makes a *prima facie* showing that the evidence to which the defendant objects was obtained in an illegal search or seizure, the burden then shifts to the State

14

to provide evidence to counter the *prima facie* case. *Id.* However, the ultimate burden of proof remains with the defendant. *Id.*

¶ 28    In this case, both before the trial judge and on appeal, the State argues that the actions taken by police officers in this case were legally sound—and that therefore the motion to suppress evidence should have been denied—because the officers acted appropriately within their community caretaking function. The community caretaking function "refers to a capacity in which the police act when they are performing some task unrelated to the investigation of crime, such as helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, or helping inebriates find their way home." *People v. McDonough*, 239 Ill. 2d 260, 269 (2010). Warrantless searches or seizures may be deemed "reasonable"—and thus permissible under the fourth amendment to the United States Constitution (U.S. Const., amend. IV)—"when police are performing some function other than investigating the violation of a criminal statute." *McDonough*, 239 Ill. 2d at 269. Accordingly, "[c]ommunity caretaking describes an exception to the warrant requirement." *Id.* As the Illinois Supreme Court has emphasized, in terms of fourth amendment analyses, community caretaking is not synonymous with consensual encounters between citizens and police officers. *Id.* at 269-72. For the community caretaking function to be invoked as an exception to the warrant requirement, and to therefore justify a warrantless search or seizure, "two general criteria" must be satisfied. *Id.* at 272. First, the court must determine, viewing the police action in question objectively, that the police were "performing some function other than the investigation of a crime." *Id.* Second, the court must determine that the search or seizure was "reasonable because it was undertaken to protect the safety of the general public." *Id.* Reasonableness, as a touchstone of fourth amendment analysis, " 'is measured in objective terms by examining the totality of the circumstances.' " *Id.* (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). In undertaking its community caretaking function analysis, a court "must

balance a citizen's interest in going about his or her business free from police interference against the public's interest in having police officers perform services in addition to strictly law enforcement." *Id.* The analysis is to be based upon "objective and specific facts" found in the record. See *id.* at 273.

¶ 29    The State argues on appeal that in this case the community caretaking function may be invoked because the actions taken by officers "were not primarily motivated by the investigation of a criminal offense, but out of concerns for the safety of an unattended infant." In support of this proposition, the State cites, as it did in the trial court, *People v. Hand*, 408 Ill. App. 3d 695, 702-03 (2011), in which our colleagues in the First District held that when an officer is making an inquiry into a child's well-being, rather than investigating a crime, the community caretaking function may be invoked to allow a warrantless entry into a home, even against the express wishes of the home's legal inhabitant. The *Hand* court rejected the notion that in such circumstances an officer is required to first employ "less intrusive methods," such as requesting "the assistance of a child protection agency" or advising an individual to get an order of protection against another individual because that "would surely thwart the intent of the community caretaking exception to the fourth amendment" and would create a situation where police officers "would never be able to use reasonable judgment to enter a dwelling even if the circumstances warranted the entry." *Id.* at 703. The court reiterated the view that the community caretaking function "is necessary for the public's protection when a police officer objectively and reasonably believes there is a need to seek information about an individual's well-being." *Id.* The court also emphasized that in the case before it, "the scope of the particular search was reasonable under the facts, once [the officer] was inside the apartment." *Id.*

¶ 30    The State also asks this court to reject the idea, raised by the defendant in the trial court, that the community caretaking function must be "completely divorced"—in all ways—from the

criminal investigative function and points to case law from the state of New Hampshire in support of such a rejection. In that case, the New Hampshire Supreme Court held that, with regard to the totality of the separation between community caretaking and criminal investigation, "the absolute separation need only relate to a sound and independent basis for each role, and not to any requirement for exclusivity in terms of time or space." *State v. D'Amour*, 834 A.2d 214, 217 (N.H. 2003). We believe the view expressed by the New Hampshire Supreme Court is consistent with binding precedent in Illinois. As quoted above, the Illinois Supreme Court has explicitly stated that the community caretaking function may be applicable when police are, *inter alia*, "responding to calls about missing persons." *McDonough*, 239 Ill. 2d at 269. We believe it is self-evident that an officer who is responding, in the officer's community caretaking function, to a call about a missing person must also remain cognizant of the fact that any missing-person situation could ultimately involve a crime and a criminal investigation. It would defy reason to suggest that an officer in that situation should not, while responding to the call in a community caretaking function, employ skills derived from his or her criminal investigation training—such as, for example, noting anything out of the ordinary, like the presence in the neighborhood in question of unusual or suspicious persons or vehicles—in the same manner that he or she would employ those skills while dispatched to an active crime scene with the express purpose of investigating that crime. Thus, we agree with the New Hampshire Supreme Court that with regard to the totality of the separation between community caretaking and criminal investigation, "the absolute separation need only relate to a sound and independent basis for each role, and not to any requirement for exclusivity in terms of time or space." *D'Amour*, 834 A.2d at 217.

¶ 31    We conclude the same is true for officers responding to a call about an unattended infant and note in particular the *Hand* court's reiteration of the view of courts in Illinois that the community caretaking function "is necessary for the public's protection when a police officer

17

objectively and reasonably believes there is a need to seek information about an individual's well-being" (408 Ill. App. 3d at 703), whether that individual is a missing person (as the Illinois Supreme Court suggested in *McDonough*, 239 Ill. 2d at 269) or an unattended infant.[2] We therefore agree that as long as there exists a sound and independent basis for each role, there is no requirement for exclusivity in terms of time and space. To hold otherwise would be to force onto police officers blinders that would not only thwart the community caretaking function, but could gravely imperil, rather than protect, the safety of the general public because it would compel police officers to ignore things that their law enforcement training instructed them not to ignore, lest they find themselves "investigating" when they were dispatched instead to caretake. Such a time/space restriction was rightfully rejected by the New Hampshire Supreme Court, as that restriction would be imprudent, unworkable, and ultimately dangerous to the public. We nevertheless agree that an important consideration for courts is ensuring that the community caretaking function does not become " 'a mere subterfuge for investigation.' " *D'Amour*, 834 A.2d at 218 (quoting *United States v. Rodriguez-Morales*, 929 F.2d 780, 787 (1st Cir. 1991)). Accordingly, a court undertaking a community caretaking analysis must identify and weigh any evidence that suggests such subterfuge, as the court determines whether the defendant has met his or her ultimate burden of proof on the defendant's motion to suppress evidence.

¶ 32    In this case, in response to the State's arguments, the defendant contends that the community caretaking function may not be invoked because the officers entered the home in question after Sneed and the defendant arrived there, which, according to the defendant, means the

---

[2]Although one might argue that, in the case of an unattended infant, there is a higher likelihood of a possible crime related thereto than there is in the case of a missing person, we have no reason to believe that is necessarily true. We note that an infant could be unattended for reasons other than criminal endangerment or neglect, such as if the infant's designated caretaker has expired or otherwise suffered an incapacitating medical emergency. In any event, the defendant has advanced no such argument in this appeal.

officers were no longer motivated principally out of concern for the welfare of the infant. In support of this proposition, the defendant points to *People v. Mikrut*, 371 Ill. App. 3d 1148, 1153 (2007), in which our colleagues in the Second District noted that once "officers have accomplished their caretaking purpose, they may not continue to expand the scope of an intrusion without additional justification." The defendant reasons that once the infant's actual caretakers—Sneed and the defendant—arrived, the officers' function as community caretakers was no longer applicable and could not be used "to actually breach the barrier of [the defendant's] front door and to enter into her home" because the police were no longer performing a function other than investigating the violation of a criminal statute. The defendant describes the question of officers breaching the curtilage of the home as "a non-issue" because the defendant's position on appeal is that the illegal search "actually began at the point they breached the threshold of the front door." At that point, she contends, "officers were well aware that [the infant] was okay." The defendant notes that Hesselbacher testified that as he followed Sneed to the room the infant was in, he looked into each room along the way to determine if an adult was at home, which she argues demonstrates that at that point he was investigating a crime, rather than checking on the welfare of the infant.

¶ 33    In reply to the defendant's arguments, the State maintains, *inter alia*, that *Mikrut* is distinguishable from this case because in this case, there was no impermissible expansion of the scope of the intrusion. The State posits that the return of Sneed and the defendant would not, as the defendant contends, assuage the concerns of the officers and terminate their community caretaking function; to the contrary, the State posits, "having been made abundantly aware the baby's caretakers had absented themselves for a night out at the bar, the police officers' interest in the well-being of the baby would seem to be heightened, not diminished." We agree. As explained above, for the community caretaking function to be invoked in Illinois as an exception to the warrant requirement, and to therefore justify a warrantless search or seizure, "two general criteria"

19

must be satisfied. *McDonough*, 239 Ill. 2d at 272. First, the court must determine, viewing the police action in question objectively, that the police were "performing some function other than the investigation of a crime." *Id.* Second, the court must determine that the search or seizure was "reasonable because it was undertaken to protect the safety of the general public." *Id.* Reasonableness, as a touchstone of fourth amendment analysis, " 'is measured in objective terms by examining the totality of the circumstances.' " *Id.* (quoting *Robinette*, 519 U.S. at 39). In undertaking its community caretaking function analysis, a "court must balance a citizen's interest in going about his or her business free from police interference against the public's interest in having police officers perform services in addition to strictly law enforcement." *Id.* The analysis is to be based upon "objective and specific facts" found in the record. See *id.* at 273.

¶ 34    In light of the extremely poor judgment demonstrated by the defendant and Sneed in leaving their infant unattended in the first place, and in light of the amount of time the officers knew, at a minimum, had passed since Sneed and the defendant had been present at the home, it was not objectively unreasonable for the responding officers to continue, rather than terminate, their community caretaking function and for them to wish to enter the home and see, up close and with their own eyes, that the infant was, at that moment, safe and not in any sort of danger or potential danger. Although the officers testified about what they saw when looking through the window, it is self-evident that an up-close examination from within the infant's bedroom might have revealed things that were not apparent from outside the bedroom. It was not objectively unreasonable for the officers to take the measures they took to ensure the safety of the infant before completing their community caretaking service call and departing the premises. It was also objectively reasonable for Hesselbacher to glance into each room he passed to see if anyone else was present in the home, for even though he did so in part to "investigate" whether other adults were present, he also did so in part for officer safety purposes; because he simultaneously had a

sound and independent basis for continuing to carry out his community caretaking function, he certainly likewise had the right to ensure his own safety and that of his fellow officers as he did so. Moreover, as Hesselbacher crossed the house, he did not enter any of the rooms along the way; he merely glanced quickly into them. Sneed himself testified that the police did not conduct any type of search of the premises. Instead, Hesselbacher followed Sneed directly to the infant and immediately checked on the safety of the infant. We reject the defendant's insinuation that the only objectively reasonable course of action for the officers to take once Sneed and the defendant arrived home from the bar would have been to terminate their community caretaking function with regard to the well-being of the infant and not enter the home without first seeking and obtaining a warrant.

¶ 35 We note as well that there is no evidence in this case that the community caretaking function was used as subterfuge for a criminal investigation, and the actions of the officers do not otherwise violate the precepts of the cases cited herein. Therefore, we are not convinced that the community caretaking exception to the warrant requirement was not available to the responding officers. We conclude that their actions did not run afoul of any constitutional requirements. Accordingly, the defendant has failed to carry her ultimate burden on her motion to suppress evidence. The trial judge's ruling (which we reiterate did not address the issue of the community caretaking function) must be reversed and this matter remanded for further proceedings.

¶ 36                                III. CONCLUSION

¶ 37 For the foregoing reasons, we reverse the order of the circuit court of St. Clair County and remand for further proceedings not inconsistent with this opinion.

¶ 38 Reversed and remanded.

21

2019 IL App (5th) 180336

NO. 5-18-0336

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS,      )      Appeal from the
                                          )      Circuit Court of
    Plaintiff-Appellant,                  )      St. Clair County.
                                          )
v.                                        )      No. 17-CF-286
                                          )
ERICA L. WOODS,                           )      Honorable
                                          )      Zina R. Cruse,
    Defendant-Appellee.                   )      Judge, presiding.

_____

**Opinion Filed:**       **September 5, 2019**

_____

**Justices:**      Honorable James R. Moore, J.

             Honorable Melissa A. Chapman, J., and
             Honorable John B. Barberis, J.
             Concur

_____

**Attorneys**    Hon. James A. Gomric, State's Attorney, St. Clair County, 10 Public
**for**         Square, Belleville, IL 62220; Patrick Delfino, Director, Patrick D.
**Appellant**  Daly, Deputy Director, Office of the State's Attorneys Appellate
             Prosecutor, 730 East Illinois Highway 15, Suite 2, Mt. Vernon, IL 62864

_____

**Attorneys**    James E. Chadd, State Appellate Defender, Ellen J. Curry, Deputy
**for**         Defender, Eun Sun Nam, Assistant Appellant Defender, Office of the
**Appellee**    State Appellate Defender, Fifth Judicial District, 909 Water Tower Circle,
             Mt. Vernon, IL 62864

_____